**WE MEDIA INC., Plaintiff,**

**v.**

**GENERAL ELECTRIC CO., National Broadcasting Company Holding, Inc., National Broadcasting Company, Inc., Cablevision Systems Corp., Rainbow Media Holdings, Inc., American Movie Classics Co., WE: Women's Entertainment, LLC, Defendants.**

**No. 01 Civ. 0424(VM).**

United States District Court, S.D. New York.

Aug. 23, 2002.

Arthur M. Lieberman, Dawn L. Rudenko, Keith D. Nowak, Lieberman & Nowak, LLP, New York City, for Plaintiff.

James W. Dabney, Pennie & Edmonds, LLP, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff We Media Inc. ("WEM") filed this action on January 19, 2001, asserting four causes of action against defendants General Electric Co., National Broadcasting Company Holding, Inc., National Broadcasting Company, Inc., Cablevision Systems Corp., Rainbow Media Holdings, Inc., American Movie Classics Co., and WE: Women's Entertainment, LLC (collectively, "Defendants"). Three claims are before the Court under 28 U.S.C. § 1331 (federal question jurisdiction) that seek injunctive and monetary relief for: (1) trademark infringement pursuant to 15 U.S.C. § 1114—18; (2) trade name infringement pursuant to 15 U.S.C. § 1125(a); and (3) trademark dilution pursuant to 15 U.S.C. § 1125(c). WEM's fourth cause of action, for unfair competition pursuant to New York common law, is before this Court pursuant to 28 U.S.C. § 1338(b). Defendants move for summary judgment against all three Federal claims.

## I. BACKGROUND

The parties do not dispute the underlying facts. Rather, each side seeks to spin them in opposite directions: the Defendants assert that WEM's evidence is insufficient to demonstrate a triable issue of fact; WEM argues that its case is strong enough to reach a jury. The Court, there-

fore, must weigh the arguments and identify the more persuasive perspective.

WEM holds several trademarks beginning with the pronoun "we", including WE and WEMEDIA.[1] All are intended to indicate WEM as the source of products and services directed towards people with disabilities. WEM has applied for registrations for use of its marks in additional fields of use. At this point, however, WEM's marks are not registered for use in the network or cable television contexts.

WEM's stated business goal "was to become the first full cross-media company addressing and attempting to mainstream the needs and interests of the disabled community." (Plaintiff We Media Inc.'s Memorandum of Law in Support of its Opposition Against Defendant's Motion for Summary Judgment ("Pl.Mem."), at 2.) In 1997, WEM launched WE Magazine, a publication designed as a lifestyle magazine for women and men with disabilities, their families and friends. WEM changed the name of WE Magazine to WeMedia Magazine and later suspended its publication following the September 11, 2002 attack on the World Trade Center. WEM launched a website (WEMEDIA.COM) in 1999 and provided network, cable and webcasting coverage for the Paralympic Games in 2000. WEM hoped to provide similar coverage for the 2002, 2004 and 2006 Paralympic Games and obtained an option to negotiate for those rights. Likewise, WEM has been a paid sponsor of numerous events in the disabled communi-

ty. Seeking income, WEM negotiated to enter joint ventures with various medical organizations that it forecasted would turn a profit. To date, however, WEM has operated at a loss.

Nevertheless, WEM's efforts achieved some recognition. As further evidence of recognition WEM introduced a list of "Key Events" (Ex. 11) that cites: New York City Mayor Giuliani's "Proclamation" of "WE Magazine Day" on an unspecified date during May of 1997; receipt of a "Millennium Award for Communications" in 1999; a "Century of Inclusion Award" which was presented at the United Nations in 1999; "Trumpet Advertizing Award/American Advertizing Awards" in 1999 and 2000; a "Media Organization of the Year" award from the National MS Society in 2000; an "Outstanding Service Award" from the New York City ADA Achievement Awards in 2000; a "Tash Image Award" in 2001; and a 2001 "Gracie Allen Award" from the Foundation of American Women in Radio and Television for programming that presents a positive and realistic portrayal of women in television; being ranked as one of the "Top 50/100 Best Sites" by the internet company Yahoo! in 2001 and 2002. Also, WE points to the various media and internet industry publications, and other periodicals, that mentioned WEM in some capacity. Celebrities, too, were attracted to promote its cause.

Sometime prior to November 28, 2000, Defendants[2] decided to "rebrand" the ca-

---

[1]. WEM registered, with the United States Patent and Trademark Office ("PTO"), WE for use in magazine, online magazine and database contexts and WEMEDIA for use in magazines and newsletters, online magazine, educational services available via the internet, clothing, online retail services, the promotion of sporting events, real estate services via the internet, fund-raising services, financial information via the internet and web site hosting, career counseling contexts.

[2]. The papers do not clearly identify which Defendant exerts control and may be held legally responsible for WE: Women's Entertainment LLC, and the service now provided under the name "WE: Women's Entertainment" ("WWE"). However, for the reasons set forth below, see infra discussion at Parts II.B–E, the Court need not allocate responsibility. For the ease of discussion only, the Court will refer to Defendants collectively.

ble television channel then known as Romance Classics by promoting it under a new name. Defendants selected the name "WE: Women's Entertainment" and sought clearance from an internal legal department for its use. Apparently, clearance consisted of attorney review of a trademark search conducted on November 6, 2000 which investigated the prior registrations and use of the words "WE" along with "WOMEN" or "MEN" or "ENTERTAINMENT". Once cleared, Defendants filed two applications with the PTO to register the words "WE: Women's Entertainment" as a mark on November 16, 2000.

WEM claims Defendants' rebranding constitutes knowing infringement of its marks and marshals' circumstantial evidence to support its claim. WEM submitted affidavits regarding a November 28, 2000 meeting between WEM employees and Mr. William Cela ("Cela"), of McCann–Erickson, intended to discuss a potential advertising agreement between the companies. Cela commented that WEM's name arose at a separate meeting during which a television network's name change was discussed, but did not identify the television network or anyone else present at the meeting (the "Cela Conversation"). WEM would deduce Defendants' knowledge that Defendants' rebranding infringes WEM's trademarks from the fact that Cindy Crawford and Alexandra Paul appeared as celebrity sponsors at certain WEM events, and later also appeared in Defendant's promotional campaign for the rebranded television network. Similarly, WEM co-hosted a charity event with the New York Rangers, which is owned by defendant Cablevision. Continuing in this vein, WEM negotiated to lease equipment from NBC, in which Rainbow Media Holdings, Inc., holds a 50 percent interest. WEM also noted that it televised the 2000 Paralympic Games via, *inter alia,* Fox SportsNet, of which defendant Rainbow

Media Holdings, Inc., holds a 26 percent interest. Moreover, WEM contends that its coverage of the 2000 Paralympic Games was so high profile that it made Defendants aware of WEM and its trademarks.

Defendants announced the new name "WE: Women's Entertainment" in December, 2000, and launched a print and video advertising campaign on January 1, 2001 for it using the song "We Are Family." By any name, Defendants' cable television channel at issue ("WWE") is marketed towards women viewers, primarily between the ages of 25 to 49, who are urban, single and have a college-education. Defendants sell WWE through distributors who provide cable, satellite or other pay television systems. Defendants also provide a website on which scheduling information for WWE may be found. Defendants consider WWE's competitors to be other cable television channels marketed towards women, including Oxygen and Lifetime. Finally, WWE is involved in "pro-social initiatives", such as sending children to camp, promoting adoption, and teaching children to read, that are called "WE CARE".

The issues before the Court continued to develop after WEM filed the Complaint. On April 16, 2001, the PTO denied WWE's applications to trademark "WE WOMEN'S ENTERTAINMENT" because it considered that mark to be very similar to the registered mark WE MEDIA, held by WEM. Meanwhile, also, WEM claims it has lost proposed projects and business ventures since January 2001. In particular, Walter Cronkite, who is a member of WEM's advisory board, declined to host a series of interviews intended to be aired on television for WEM. Future joint business ventures with The Hearst Corp. and Specialty Med Alliance foundered as well. Apparently, also, WEM chose to not exercise its option to negotiate for rights to

future Paralympic Games. WEM's theory of causation appears to be based on its claim that the WWE's media "blitz" destroyed WEM's partnerships and plans because, in the media industry, two media companies cannot share the word "WE" in their titles.

Additionally, WEM submitted evidence that it received inquiries via email and voicemail from what it alleges are confused WWE viewers seeking to reach WWE. In addition, a third party, Linda Shepard ("Shepard"), stated that she received 10 to 15 emails and 45 to 50 phone calls from individuals who thought WWE was part of WEM. Shepard has been employed as executive director at various organizations that advocate for individuals with disabilities. Indeed, she asserts that she made an inquiry to WEM about providing cable television content for WWE on the mistaken impression that WWE was a part of WEM. Neither party submitted evidence showing that individuals contacted WWE in hopes of reaching WEM.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" demonstrate an absence of any genuine issue of material fact and "the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To support a granting of the motion, the Court must determine from the record before it that a

reasonable trier of fact would not be able to find in favor of the non-movant. *See Brady v. Colchester*, 863 F.2d 205, 211 (2d Cir.1988). In considering the motion, the evidence is viewed in the light most favorable to the non-moving party, and reasonable inferences and factual conflicts are resolved in his favor. *See Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir. 1992). An expert's affidavit may raise a material question of fact so long as the expert, in his affidavit, sets forth more than mere conclusory opinions. *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25–26 (2d Cir.1994).

### B. *TRADEMARK DILUTION*

Defendants' first argument for summary judgment is made against WEM's third cause of action: trademark dilution. Defendants argue that no evidence supports the proposition that either the WE or WEMEDIA mark is famous. WEM argues that its marks are famous within "its channels of trade, *i.e.*, the not-for-profit industry." (Pl.'s Brief, at 24.)

To state a cause of action for dilution under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) ("FTDA"), a plaintiff must establish five elements: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." [3] *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999); *see also New York Stock Exchange, Inc. v. New York*, No. 99–9276, 2002 WL

---

**3.** WEM wrongly cites *Nabisco* as support for a four part test that compounds the first and second above-listed elements into one. The *Nabisco* decision expressly rejected such a reading of 15 U.S.C. § 1125(c)(3) by separately enumerating five elements and instructing that: "Distinctiveness in a mark is a charac-

teristic quite different from fame," *id.* at 215; and "It is quite clear that the statute intends distinctiveness, in addition to fame, as an essential element," *id.* at 216. Based as it is on a misreading of the law, the Court finds WEM's analysis unpersuasive.

483528, at *5–*6 (2d Cir. April 1, 2002). Thus, the FTDA "differs from traditional trademark law in that the class of entities for whose benefit the law was created is far narrower." *TCPIP Holding Co., Inc., v. Haar Communications, Inc.,* 244 F.3d 88, 95 (2d Cir.2001).

The first element's term, "famous", is "used in [its] ordinary English language sense." *Nabisco,* 191 F.3d at 215. But also, the fame of the mark must relate to "its capacity as a mark designating the plaintiff's goods." *TCPIP,* 244 F.3d at 97 (2d Cir.2001). The Second Circuit further interpreted the legislative history of the FTDA: "Congress envisioned that marks would qualify as 'famous' only if they carried a substantial degree of fame." *Id.* at 99.

To determine if a mark is famous, a court may consider:

(A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1); *see also New York State Soc. of Certified Public Accountants v. Eric Louis Associates, Inc.,* 79 F.Supp.2d 331, 343 (S.D.N.Y.1999).[4]

Evidence of public recognition is critical to the fame analysis. *See TCPIP,* 244 F.3d at 88. In *TCPIP,* the Second Circuit vacated a preliminary injunction because plaintiff submitted insufficient, "sketchy" evidence of fame. *Id.* at 95. Plaintiff submitted an affidavit that it operated 228 retail stores in 27 states under the registered mark "The Children's Place," and had sales of $280 million. It had spent "tens of millions of dollars" on advertising its descriptive mark. But the plaintiff introduced no consumer surveys, press accounts or other evidence that demonstrated how effective was its advertising. Without evidence of public recognition, the

---

4. WEM erroneously relies on *Citigroup Inc. and Citicorp. v. City Holding Company,* 171 F.Supp.2d 333 (S.D.N.Y.2001), for the proposition that the first element is satisfied according to the mere dictionary meaning of the term. In *Citigroup,* however, the district court considered the factors enumerated above. *See id.* at 351. That court first found the plaintiff's marks ("CITI" was the common element shared by a group of marks owned by Citicorp) because "[t]he key marks in the CITI family had, by 1990, been in use for 15 to 30 years or more. Advertising expenditures have been in the range of hundreds of millions of dollars and the relevant trading area has been the United States as a whole since the early 1970's." *Id.* at 351–52. Nevertheless, there was no dilution by the defendant because it had not used its mark in the national banking and financial services market. *See id.* at 352. Furthermore, applying the analysis pronounced in *TCPIP,* the defendant had not established fame to support its counterclaim of dilution. *See id.* at 353–354. Defendant "had been in business some 7½ years, has 8 employees, has no independent offices ... had no revenues in the years 1998–2000, has insignificant advertising expenditures, and has approximately 1,400 customers ... 90% of which reside in West Virginia." *Id.* at 343. Because defendant was not famous on a national scale, and "even within the State of West Virginia, [defendant's mark] is not a famous mark", the court granted summary judgment against defendant. *Id.*

Circuit Court could not find fame. *See id.* at 99–100.

WEM relies on the *Eric Louis* decision as precedent for the proposition that the senior mark need not be famous in all fields. In that case, which was decided before the Second Circuit announced in the *TCPIP* decision what degree of fame it believes Congress intended the FTDA to require, the plaintiff was a non-profit organization that sought to further the profession of accounting. The district court found that plaintiff had used the mark since 1984, conducted extensive advertising and promotion activities, and had received free publicity. The plaintiff had 30,000 members, most of whom lived in or near New York State. Thus, "in the accounting channel of trade in the New York trading area, there is a high degree of recognition of the Society's mark, and thus the mark is famous in this particular trade and geographical area." *Id.* at 344. After evaluating each of the five factors, that court found defendants use did dilute plaintiff's mark. *Id.* at 346.

The analysis followed in the *Eric Louis* decision is not binding on this Court nor, in light of the facts presented by WEM, would its analysis carry WEM's case. First, *Eric Louis* was decided before the Second Circuit interpreted in *TCPIP* the quantum of fame required under the FTDA. Moreover, in *TCPIP*, the Second Circuit scrutinized legislative history to conclude that: "It seems most unlikely that Congress intended to confer on marks that have enjoyed only brief fame in a small part of the country, or among a small segment of the population, the power to enjoin all other users throughout the nation in all realms of commerce." 244 F.3d at 99. This rule furthers the federal policy of promoting competition as well as the Lanham Act's underlying policy of protecting consumers and manufacturers from deceptive representations of affiliation and origin. *See Nora Beverages, Inc. v. The Perrier Group of America, Inc.*, 269 F.3d 114, 119 (2d Cir.2001) (citation omitted). By protecting only famous marks from being undermined by second-comers' use of a similar mark, the FTDA encourages businesses to strengthen the source-identifying aspect of their marks. This higher hurdle, which thus encourages businesses to make their goods, marks and trade dress distinguishable from others', in the end assists the consumer in making a purchase free from confusion. A lower threshold would provide correspondingly less incentive to businesses. Second, even if the Court were to ignore the Second Circuit's reasoning, the analysis employed in *Eric Louis* relied on both the trade and geographic limits of that plaintiff's mark in its "fame" analysis. But WEM's proposed channel of trade puts at issue only a trade limit. Thus, the facts of this case do not qualify for or warrant such a limitation.

The second element refers to the statutory, legal meaning of the word "distinctive". The level of protection accorded such mark depends on its degree of distinctiveness as measured on the classic, Lanham Act continuum. As the Second Circuit has described that continuum of distinctiveness and associated protection:

At the low end are generic words—words that name the species or object to which the mark applies. These are totally without distinctiveness and are ineligible for protection as marks because to give them protection would be to deprive competitors of the right to refer to their products by name.... One rung up the ladder are "descriptive marks"—those that *describe* the product or its attributes or claims.... The next higher rung belongs to "suggestive" marks; these fall in an in-between category. They do not name or describe the product for which they are used, but they suggest the qualities or claims of that

product. They are more distinctive than descriptive marks, and thus are accorded trademark rights without the need to demonstrate that consumers have come to associate them with the user of the mark. Nonetheless because they seek to suggest qualities of the product, they possess a low level of distinctiveness. They are given less protection than is reserved for more distinctive marks— those that are "arbitrary" or "fanciful." A mark is arbitrary or fanciful if there is no logical relationship whatsoever between the mark and the product on which it is used.... The most distinctive are marks that are entirely the product of the imagination and evoke no associations with human experience that relate intrinsically to the product.... The strongest protection of the trademark laws is reserved for these most highly distinctive marks.

*Nabisco*, 191 F.3d at 215 (internal citations omitted) (emphasis in original). A mark that is descriptive "does not come within the protection of the [FTDA]." *TCPIP*, 244 F.3d at 93.

Defendant's motion does not put at issue the third, fourth or fifth elements. For the reasons set forth below, the Court need not reach even the second element.

■ The Court starts its analysis with the fame element and considers the factors identified by Congress in the FTDA text itself. WEM has introduced no evidence of acquired distinctiveness. WEM did introduced evidence of the awards it has won for its website and magazine. But, in the Court's view, the listed awards tend to show that WEM's business served a laudable goal and the product was well respected within its channels of trade. The remainder of WEM's Key Events involve sponsorships and other ventures bought by WEM. WEM's submissions do not tend to show that the public recognized WEM's marks to signify WEM's products and services.

Regardless of the awards, and as Defendants point out, survey evidence does not support WEM's claim to acquired distinctiveness. In October, 2000, WEM retained Group Plus, Inc. and Yahoo! to conduct surveys. According to its report, Group Plus conducted thirteen focus groups between October 9 and October 25, 2000, which were designed primarily to "identify the informational needs of the disabled population" and secondarily, to "identify the primary target audience(s) for the WeMedia effort." (Supplemental Declaration of Jonathan Moskin in Further Support of Defendants' Motion for Summary Judgment, dated Apr. 5, 2002 ("Moskin Decl."), at Ex. 20.) Thus the Report was not intended to measure brand awareness of WEM; rather, it was designed to help WEM increase awareness of its brand. Nonetheless, it found that: "There was a very low level of awareness of WeMedia among the people in these groups." (*Id.*)

Similarly, the Yahoo! survey was not designed to measure the precise question before the Court but to "study use of Yahoo! and Yahoo! Sports, webcasting viewing habits, interest and awareness of disabilities and WeMedia.com, and attitudes about donating charities." (Declaration of Non–Party Yahoo! Custodian of Records Cathy McGoff, dated February 13, 2002, at Ex. A.) However, it did ask survey respondents "Do you know about WeMedia.com or We Magazine" and concluded that:

Almost half of the survey respondents know someone with a disability and 16% have a disability themselves. However, very few knew of WeMedia.com or We Magazine—even within a community of people who know disabled friends or family, or have a disability there is not strong brand awareness yet.

(*Id.*) Dr. Robert C. Sorensen, who opines on the issue of likelihood of confusion, developed and administered an "experimental" survey that purportedly included questions concerning whether WEM's trademarks were well-recognized. Inexplicably, the results of this survey were lost. (Moskin Decl., at 51.) Thus, WEM has produced no survey evidence in support of its argument that its marks are famous.

To complete its analysis of the first FTDA factor, the Court turns to inherent distinctiveness. Whether a mark is inherently distinctive involves evaluation of the mark's placement along the classic trademark continuum discussed above. *See Nabisco,* 191 F.3d at 215. WEM's marks, WE and WE MEDIA, do not instantly invoke the idea of a person with a disability's needs or interests. Thus, the marks are not generic or descriptive. Rather, WE standing alone denotes inclusiveness and WE MEDIA denotes inclusive communications. Because WEM seeks to promote and make mainstream the concerns and interests of the disabled community, through means of media, the marks are suggestive. It takes only a little imagination to divine that goal from the mark and WEM's products and services. WEM's argument that its marks are arbitrary or fanciful fails because of the message of inclusiveness that WEM's marks, products and services share.

Turning to the remaining FTDA factors, WEM has marketed its goods and services under the WE and WE MEDIA marks since 1997, which is a middling degree of duration that does not weigh in favor of or against a finding of fame. WEM's advertising efforts have been costly and, considering its role in providing media coverage for the Paralympic Games in 2000, its reach has been international in scope. Again, however, WEM did not produce any evidence to show that these efforts were successful on a national or international level. Finally, WEM has registered its WE and WE MEDIA marks. However, WEM's registrations to date are limited to the print and internet media context, and do not include the network or cable television channels of trade.

WEM contends its marks are famous within the limited, not-for-profit channel of trade. As the Court has already explained, to draw such a limitation would be inappropriate. *See TCPIP,* 244 F.3d at 99. The Court considers WEM's evidence in support of this argument to determine whether it will satisfy the quantum of fame required by the Second Circuit. WEM submitted the affidavit of David Mancione, dated March 12, 2002 ("Mancione Aff."). Mancione is president and CEO of Specialty Med Alliance and "regularly and extensively worked with non-for-profit [sic] companies". (*Id.,* at ¶ 16.) Specialty Med Alliance and WEM had been negotiating an internet venture that Mancione alleges ceased to be "viable" after defendants launched WWE. (*See id.,* at ¶¶ 17–22.) Mancione stated "unequivocally" that WEM "was an exceptionally well-known brand among the not-for-profit companies, which combined receives and spends tens of billions of dollars a year in the community with disabilities and advertises extensively on television." (*Id.,* at 16.) Mancione did not quantify or otherwise explain what he meant by "exceptionally well known" nor did WEM flesh out his conclusory assertion with other corroborating evidence. The Court finds this anecdotal evidence, standing alone, to be self-serving and too sketchy to warrant a finding of fame even within the limited, not-for-profit channel of trade.

Based on the record before it, the Court cannot find that WEM's trademarks were sufficiently famous to support a claim for trademark dilution under the FTDA. The evidence submitted to the Court tends to

show that WEM's marketing and/or product was of high quality and its business goals addressed a worthy cause. However, the heart of the question before the Court concerns quantity of recognition, not quality or merit of the product itself. As such, the Court finds that WEM has not identified a genuine issue of material fact nor produced sufficient evidence in support of its trademark dilution claim to withstand summary judgment against it.

## C. MONETARY RELIEF FOR TRADEMARK INFRINGEMENT UNDER LANHAM ACT

Defendants' second ground for summary judgment seeks the dismissal of WEM's claims for monetary relief made under the Lanham Act because WEM cannot identify any misdirected sales or willful misconduct on the part of Defendants, as is necessary. WEM counters that it has shown actual consumer confusion and Defendants' willful conduct. As such, WEM seeks to recover the 50 million dollars that it invested in the promotion of its marks and other promotional contracts as well as lost profits arising out of its inability to (1) exercise its option to negotiate for future Paralympic Games rights (2) complete a proposed joint venture with Specialty Med Alliance and (3) realize profit on its business plans. (Pl. Mem., at 18.) WEM argues further that it is entitled to an accounting of Defendants' profits.

Pursuant to 15 U.S.C. § 1117(a), "subject to the principles of equity" a successful plaintiff in an action brought under the Lanham Act is entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action"; in "exceptional cases" reasonable attorneys fees may also be awarded. *See also International Star Class Yacht Racing Association v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 752 (2d Cir.1996) ("*ISCYRA*"). Case law establishes certain limits within which a district court may

exercise its "principles of equity" discretion.

A district court may award damages only if the plaintiff has proven "actual consumer confusion or deception resulting from the violation or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir.1992) (internal citations and quotations omitted). Finally, a district court may award "costs of the action" subject to "principles of equity" even without a showing of wilfulness. *See Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F.Supp.2d 161, 170–71 (S.D.N.Y.1999); *Gidatex v. Campaniello Imports*, 82 F.Supp.2d 136, 149–50 (S.D.N.Y.2000).

A court may award defendants profits to a successful plaintiff "if the defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if an accounting is necessary to deter a willful infringer from doing so again." *W.E. Bassett Company v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir.1970); *see also ISCYRA*, at 753. In order to obtain an award of profits, a plaintiff must first show that the defendant made sales using the infringing mark; then, the burden is on the defendant to disprove economic gain. *See Mishawaka Manufacturing Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942) ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark."); *George Basch*, 968 F.2d at 1539.

Putting aside the other necessary elements of a trademark action, for WEM to recover damages, the Court must deter-

mine that WEM has shown actual consumer confusion or deception resulting from WWE's conduct (assuming it to be a violation) or whether WEM has shown that WWE's actions were intentionally deceptive. *See George Basch,* 968 F.2d at 1537. As previously discussed, WEM has submitted anecdotal evidence that WWE customers contacted WEM out of confusion. Shepard, a participant in the not-for-profit industry, contacted WEM on the mistaken impression that WWE was connected to WEM. She further stated she received 55 to 65 inquiries from others sharing her impression. But, there is nothing on the record to identify these inquiries or indicate whether each individual was confused by the WWE marketing itself or by gossip and word-of-mouth. Further, WEM has not stated that it received additional inquiries similar to Shepard's. The number of confused persons, as such, appears to be negligible.

Further, the foregoing evidence does not tend to show any confusion leading to misdirected sales. At most it shows that WEM may have lost some nominal amount of manpower to correcting confused impressions. But WEM has asserted no claim for, nor submitted any evidence quantifying, such losses.

In addition, WEM submitted the expert opinion of Robert Sorensen, whom it retained to conduct a national survey examining whether there is a likelihood of confusion between WEM and WWE's marks. He found that over one third of his survey's respondents believed WEM and WWE were sponsored by or affiliated with one another. (Declaration of Dr. Robert C. Sorensen, Ph.D. Pursuant to Fed. R.Civ.P. 26, dated Oct. 23, 2001 ("Sorensen Report"), at Ex. 3.) Indeed many respondents believed that WE Media and WE magazine concern women. (*See id.*)

■ Due to flaws in its methodology, the Sorensen Report does not provide support for WEM's case. Germane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions. *See Trouble v. Wet Seal, Inc.,* 179 F.Supp.2d 291, 308 (S.D.N.Y.2001) (citations omitted). By contrast, Sorensen did not use pictures or advertisements that approximate what a potential customer would encounter in making her television-viewing choices. Thus, by presenting respondents with word lists, Sorensen essentially measured respondents' word associations devoid of context. Accordingly, the information within Sorensen's Report does not go to the issue at bar.

Nor does WEM's evidence tend to show that WWE was unjustly enriched by WEM's prior existence, good will in the market place or other marketing efforts. That WWE reported an increase in viewers and sales following the January 1, 2001 launch of the WWE promotional campaign. But WEM articulates no clear theory on why it is the name itself, and not the other promotional efforts or service changes, that caused these sales.

WWE submitted evidence to show it did not profit from the use of its marks as infringements of WEM's marks. In particular, WWE disproved, by deposition testimony of a Johnson & Johnson representative, WEM's initial accusation that the company Johnson & Johnson advertised on WWE because it mistook WWE for WEM. (Deposition of Michael A. Giarraputo, dated September 10, 2001, at 39–32, 41–47.) Thus, nothing on the record supports WEM's position that WWE profited or was otherwise enriched by virtue of infringing WEM's marks.

■ WEM also asserts that it has demonstrated that WWE's actions were intentionally deceptive or willful, thus giving rise to a rebuttable presumption of consumer confusion. A finding of intentional

infringement may be made where an aura of indifference for the plaintiff's rights surrounds a defendant's actions. *See W.E. Bassett Co.*, 435 F.2d at 662. WEM seeks to draw such a aura via circumstantial evidence.

WEM argues that Defendants' awareness that the rebranding effort would infringe and injure WEM may be inferred from the Cela Conversation, WEM's sponsorship of the 2000 Paralympic Games, and the fact that WWE and WEM employed the same celebrities. The Cela Conversation, however, does not support WEM's argument because Cela did not identify the television station at issue or what was said regarding WEM. For the reasons discussed in the Court's finding that WEM's marks are not famous either nationally or in its channel of trade, *see supra* discussion at Part II.B., WEM's other two arguments fail.

WEM also invokes a six-degrees-of-separation argument that because WEM dealt with corporate entities owned in part by certain Defendants, Defendants knew of WEM. Given the legal divide between the day-to-day operations of a corporation and its shareholders or between a parent and subsidiary, *see Berkey v. Third Avenue Railroad Company*, 244 N.Y. 84, 87, 155 N.E. 58 (1926) (Cardozo, J.), WEM's factual arguments are too attenuated to support its point. WEM's arguments to pierce the corporate veil between Cablevision and the other defendants does not address the relationships it would draw—between the New York Rangers and Cablevision and between Fox SportsNet and Rainbow Media Holdings, Inc.—in order to show knowledge.

WEM does not articulate a clear theory of causation beyond the proposition that there cannot be two media companies sharing the word WE in their names. The record contains facts that undermine WEM's theory. Prior to Defendants' se-

lection of the name "WE: Women's Entertainment", and within WEM's established market of print communications, a number of other magazines used the pronoun (or phonetic sound) "we" in their names. These various magazines focused on: women in business, wedding planners, computer users, women's environments, a law firm and pornography. Thus, WEM already did share the word "we" with other media companies. Such third-party use reduces the persuasive power of WEM's theory.

If one accepts that theory, then WEM's argument flows as such: prior to January 1, 2001, although WEM failed to make a profit, its financial future appeared full of opportunities. On January 1, 2001, its prospects turned bleak because Defendants chose the name "WE: Women's Entertainment." The semantic similarities and temporal connection between WWE's promotion and WEM's failed business dealings form the factual foundation of WEM's case.

Thus, even taking all of WEM's arguments together, the evidence is insufficient to impute Defendants' knowledge or disregard for WEM's rights. The record leaves open no question of material fact regarding willful infringement and neither damages, profits nor an accounting are justified in this case. Accordingly, the Court dismisses WEM's claims for damages under the Lanham Act.

## D. *INJUNCTIVE RELIEF FOR TRADEMARK INFRINGEMENT*

Defendants' third ground for summary judgment seeks to dismiss WEM's claims for injunctive relief made pursuant to the Lanham Act, because WEM cannot show the required element "likelihood of confusion." WEM argues that it has met the "likelihood of confusion" requirement.

■ To show trademark infringement under the Lanham Act, a plaintiff must show that (1) it has a valid trademark entitled to protection under the Lanham Act and (2) that the use of defendant's mark infringes, or is likely to infringe, the plaintiff's mark. *See Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 137 (2d Cir.1999). There is no contention that WEM's marks are invalid.

■ To determine whether a plaintiff has shown the second element of a trademark infringement action, a Court must assess whether there is a likelihood of confusion between the marks before it. *See Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961); *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 579–580 (2d Cir. 1991). A "likelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely possible." *Nora Beverages, Inc. v. The Perrier Group of America, Inc.,* 269 F.3d 114, 121 (2d Cir. 2001) (internal quotations and citations omitted).

■ In this Circuit, a court looks to the following eight factors to determine whether there is a likelihood of confusion:
(1) the strength of the plaintiff's mark or dress; (2) the similarity between the two marks or dresses; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.
*Morningside Group,* 182 F.3d at 138 (citing *Polaroid,* 287 F.2d at 495). A court may dismiss a claim made under the Lanham Act if the plaintiff proffers no evidence of actual confusion or intentional deception in response to a motion for summary judgment. *See, e.g., Boosey & Hawkes Music Publishers, Ltd. v. The Walt Disney Company,* 145 F.3d 481, 493 (2d Cir.1998).

### 1. *The Strength of the Plaintiff's Mark*

Under this factor, the Court examines the strength of a mark according to its placement on the continuum described in *Nabisco* and as weakened by third-party use. *See The Morningside Group,* 182 F.3d at 139; *Nora Beverages,* 269 F.3d at 123. The strength of a mark is "examined principally in the market in which the mark is used." *The Morningside Group,* 182 F.3d at 139. Third party use of the same or similar mark on different products or services does not necessarily undermine the strength of the mark in its own market. *See id.* ("Here the relevant market is the relatively small world of financial investment professionals. But the district court did not limit itself to that market in its examination of third-party users of the [mark]—a faulty analysis that led to the ultimately incorrect conclusion that the mark is weak.").

WEM claims the relevant market is the not-for-profit market, but it is a for profit company. WEM's products and services, and target audience, relate to individuals with disabilities. WEM uses its marks in the magazine and internet mediums but had plans to enter the television market through the Walter Cronkite interview series and future Paralympic Games. Thus, the question of relevant market is not neatly answered. The Court looks to WEM's actions, rather than assertions, and determines the relevant market to be the disabled community as reached primarily via the print and internet communications media.

As already discussed, *see supra* discussion at Part II.B., WEM's marks are suggestive. This determination is not altered

by limiting the Court's analysis to the relevant market.

At the same time, extensive third party use of words contained in a mark may render even a registered mark weak. *See Lang,* 949 F.2d at 581. As already discussed, *see supra* discussion at Part II.C., there is evidence on the record of this motion that third parties did use the word "WE" in the magazine context. Although such third-party use would reduce the strength of WEM's mark in the magazine context, the issue before the Court is WEM's marks in the television context.

The record before the Court reveals no third party usage of the word "WE" in the television context prior to January 1, 2001. Indeed, WEM's foray into the television market was limited to special programming. As such, the Court cannot conclude that WEM had a presence in the television market either. As previously discussed, *see supra* discussion at Part II.C., there is insufficient evidence to conclude that WWE willfully preempted WEM's entry into that market. Therefore, the strength of WEM's suggestive marks must be reduced to reflect third-party usage and its own lack of usage.

### 2. *The Similarity Between the Two Marks or Dresses*

Starting with the basic content of the terms "WE" and "WE MEDIA" versus "WE: WOMEN'S ENTERTAINMENT", the general impression conveyed to the public is similar. *See, e.g., BigStar Entertainment, Inc. v. Next Big Star, Inc.,* 105 F.Supp.2d 185, 205 (S.D.N.Y.2000). The emphasis on the term "WE" in both marks is similar, regardless of any difference in the stylized presentation of the parties' marks. WWE contends it uses "WE" as an acronym for "Women's Entertainment", which of course carries the appealing secondary meaning of "you and me." (*See* Def. Mem., at 24; Reply, at 6.) As such,

both share a spirit of inclusiveness and community. This similarity is especially strong in light of Defendants' use of the song "We Are Family" in promoting WWE. On balance, this factor tends to show a possibility of confusion.

### 3. *The Proximity of the Products in the Marketplace*

When two parties "provide essentially the same service to the same customer base" their services are proximate, this element thus weighs in favor of finding a likelihood of confusion. *The Morningside Group,* 182 F.3d at 140. To date, WEM has provided content concerning individuals with disabilities for distribution through print and internet media. In addition, WEM was involved in providing special programming related to the sports for television, that is, the 2000 Paralympic Games. WEM further won a Gracie Allen Award for its television portrayal of women. Despite its status as a for-profit company, WEM considers its mission to be philanthropic.

Defendants, on the other hand, claim to market WWE to women and distribute it as a cable television channel accompanied by an internet site. WWE provides television programming about and relating to women. WWE is associated with some philanthropic endeavors through the WE CARE program. Thus, there is some overlap between the two parties' products markets. But the overlap is too slight for the Court to conclude that the parties directly compete at this time.

### 4. *The Likelihood That The Prior Owner Will Bridge The Gap Between The Products or Services*

The fourth *Polaroid* factor "protects the senior mark's interest in safeguarding avenues of future expansion into a related field which would create both direct com-

petition with the junior user and the likelihood of confusion." *BigStar*, 105 F.Supp.2d at 212. WEM asserts that it would have entered the television market were it not for WWE's actions. WEM supports its assertion by submitting evidence that Walter Cronkite would have done a television series of interviews for WEM were it not for WWE's arrival. Likewise, WEM blames WWE for WEM's failure to exercise its option to obtain rights for future Paralympic Games.

WEM has stated that it cannot fulfill any of its plans so long as Defendants operate WWE under the moniker "WE: Women's Entertainment." In support of this statement, WWE submitted sworn statements from individuals who had discussed joint ventures or other projects with WEM in which these individuals justify their decisions to terminate the project or plan. (*see* Cronkite Aff.; Mancione Aff.)

WEM's evidence demonstrates that it contemplated entering the television market by producing special programming, not providing an entire television network to the public. Thus, WEM did intend to bridge the gap to some extent, but not the entire gap. Regardless, in light of WEM's prior work and documented plans to continue to make special programming for television, this factor tends more toward a finding a possibility of confusion, than against.

### 5. *Evidence of Actual Confusion*

WEM's strongest evidence purporting to show actual confusion would be Sorensen's Report concluding that one-third of his respondents believed WWE and WEM to be affiliated. But, Sorensen's methodology in reaching this conclusion was flawed (*see supra*, discussion at Part II.C.) and his Report carries little probative value.

A showing of actual confusion is not necessary. *See W.E. Bassett Company v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir.

1970). A court may infer the possibility of confusion from the PTO's refusal to register the second-comer's mark. *Id.* Nevertheless, the PTO's decision that a mark is not entitled to registration pursuant to 15 U.S.C. § 1052 is not binding on a subsequent court proceeding to determine the likelihood of confusion for purposes of an infringement analysis. *See Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 743–44 (2d Cir.1994); *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734–35 (2d Cir.1991).

Accordingly, while this Court may, but need not, infer the possibility of confusion from PTO's refusal to register WWE's mark, such an inference would be unwarranted in this case because WEM produced scant evidence that WEM's marks actually are recognized by the public. *See supra*, discussion at Part II.C. This factor does not weigh in favor of a finding of likelihood of confusion.

### 6. *The Defendant's Bad Faith*

"Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion." *The Paddington Corporation v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 586–87 (2d Cir.1993). Furthermore, "actual or constructive knowledge of the prior user's mark or dress may indicate bad faith." *Id.* at 587 (citations omitted). The Court already found that WEM's evidence and arguments that Defendants committed a knowing infringement to be insufficient. *See supra*, discussion at Part II.C. These arguments apply equally here but have no greater power at this step of the analysis. This *Polaroid* factor thus weighs against a finding of likelihood of confusion.

### 7. *The Quality of the Defendant's Product*

When a junior, low quality product takes advantage of the public goodwill earned by

a senior product, a finding of likelihood of confusion may be appropriate. *See Big Star,* 105 F.Supp.2d at 214. There is no contention that WWE's product or services are of low quality. Thus, this factor does not show that there is a likelihood of confusion between the marks here at issue.

### 8. *The Sophistication of the Relevant Consumer Group*

The likelihood of confusion depends on the sophistication of the consumer: in general, unsophisticated buyers are more likely to be confused and sophisticated buyers are less likely to be so. *Big Star,* 105 F.Supp.2d at 214 (citing *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1137 (2d Cir.1979) and *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 79 (2d Cir.1988)). Defendants argue that because cable and other television providers are the direct purchasers of WWE, its consumers are sophisticated. WWE's argument is disingenuous because its services ultimately target a specific set of viewers.

Nevertheless, the targeted viewers are sophisticated in the sense that (1) the women have college educations and (2) have purchased WWE as part of a television package which charges a significant monthly fee. WEM's consumers, too, represent a sophisticated group in the sense that they are seeking niche products and services. Thus, the sophistication of the targeted audiences does not tend to show a likelihood of confusion.

### 9. *Balancing of the Polaroid Factors*

 Having considered each factor individually, the Court must now weigh them as a whole. Even if a few of the individual *Polaroid* factors tend to show that confusion is possible, none show that it is probable. *See Nora Beverages,* 269 F.3d at 121. Some confusion is always possible; but there must be some threshold quantum that crosses from mere possibility into a probability. WEM's pro-

duction does not cross that threshold. Rather, WEM rests on the metaphysical possibilities of semantic similarities, and provides no evidence that WWE's arrival actually confused WEM's audience as to the source of WEM's goods and services. Trademark law is designed to protect against unfair competition in the marketplace, not to protect companies holding trademarks from the realities of competition in the marketplace. As such, WEM has not shown a likelihood of confusion nor has WEM's proffer of facts raised a genuine question of material fact warranting trial of the issue. On this basis, the Court dismisses WEM's claims for injunctive relief pursuant to the Lanham Act.

### E. *REMAINING CLAIMS*

In the absence of any remaining federal claims, the Court declines to exercise supplemental jurisdiction over WEM's state claims. *See* 28 U.S.C. § 1338(b). As such, the Court dismisses them without prejudice to filing in an appropriate forum.

## III. *ORDER*

For the reasons discussed above, it is hereby

ORDERED that Defendants Motion for Summary Judgment is granted; and it is finally

ORDERED that the Clerk of Court close this case.

**SO ORDERED.**